PEOPLE v. MERINGOLA.

(Supreme Court, Appellate Division, Second Department. June 8, 1906.)

HOMICIDE—MURDER—EVIDENCE—SUFFICIENCY.

       On a prosecution for murder, where the defense was insanity, a conviction *held* not warranted by the evidence.

Appeal from Trial Term, Suffolk County.

Sandow Meringola was convicted of murder in the second degree, and he appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, HOOKER, and MILLER, JJ.

Martin T. Manton (Charles C. Branch, on the brief), for appellant. Livingston Smith, Dist. Atty., for the People.

HOOKER, J. The defendant was indicted by the grand jury of the county of Suffolk of the crime of murder in the first degree, in that from deliberate and premeditated design he effected the death of his brother, Dominica Meringola, by cutting his neck and throat with an axe on the 20th day of June, 1904. The fact of the killing and its manner were not denied upon the trial, but the defendant relied solely upon the defense of insanity. The trial took place on the 28th day of September, 1904. It appeared that, although the defendant and his brother had been on the best of terms and were together for some time on the day of the killing, yet without apparent motive the defendant, as

he stood in front of the house of the deceased, knelt down, and kissing the feet of his victim said, in the presence of a daughter of the deceased, "Excuse me if I do something to you," and rising immediately delivered two severe blows with an axe, nearly severing his brother's head from his body. No words passed between the two brothers, and the undisputed evidence is that so far as known they had never quarreled. The defendant immediately left the premises, and calling at the house of a woman acquaintance demanded a knife that he might commit suicide, and upon her refusal to supply him with one shot at her. While he was still at that house, and after he possessed himself of a knife, one of the witnesses for the people pursued him, calling upon him to surrender, but the defendant shot at him instead. Upon being fired upon himself, the defendant threw up his hands, and voluntarily approached his captor, but succeeded, however, in cutting his own throat with a knife before he was taken into custody. The defendant was an uneducated Italian, who had been in this country a number of years, and had through industry and care become possessed of a half interest in some property owned by himself and his brother, whom he killed.

A fellow Italian, called as a witness for the defendant, testified that he had known the defendant and had worked with him for nine or ten years. Two days before the killing the defendant called the witness away from his work, and standing aside said that he was afraid people might see him, and then started to run through near by woods. The witness called after him several times, but the defendant paid no attention to him. He then followed him, and soon overtook him, when the defendant again stated that there was somebody after him, but that he did not know who his pursuer was. The defendant then laid flat on the ground for fear this unknown person might recognize him. The witness testified to a repetition of similar conduct on the same day, and to a statement made to him by the defendant that there was a regular society of men who wanted to kill him. Upon an invitation to come over and go to work, the defendant stated that he could not do so, because it was a spot where everybody could see him. He then saw a child coming towards them, and started to run away. The witness pursued, and when he reached the defendant the child came up near them, and the defendant fell flat on his face, and tried to hide himself on the ground. When he had been quieted, he said he was afraid of a gang of malefactors that were running after him, and stated that his brother had sent these people after him. At that moment he did not say anything about the children. Pointing his finger, he then said, "There is my enemy there hidden in the woods," but there was no one there. A son of the defendant testified that at various times during the month or six weeks prior to the homicide his father had conceived the notion that a Polish friend, who had always been kindly to him, had been sent by his brother to kill him. The son says that at times the defendant would feel shy of children, and run away from them. One of the keepers of the prison where the defendant was confined awaiting trial was sworn in his behalf, and testified that during that confinement defendant made an effort to commit suicide by cutting open the arteries in his arm with a piece of tin, and the bandages with which the wounds were dressed he tore off the next night. Later he

tore the slats off his bed. On another occasion, some six weeks subsequent to the homicide, the keeper, hearing a loud noise in defendant's cell, approached quietly, and saw the defendant jumping around on the floor. When spoken to, he quieted down, however. This was the same morning he attempted suicide. The keeper also heard him say that he had killed his brother and had seen him.

Two alienists were sworn for the defendant. Dr. Macumber during the week before the trial examined the defendant in prison. He describes the result of his examination in this language:

"He seemed to be imbued with the idea that he was the victim of a conspiracy. He had delusions of persecution and hallucinations of hearing. He heard voices through the walls; thought that his brother was talking to him—the one he had killed—and he was fearful that the examiner, that is myself, was going to do him some bodily harm. Through the interpreter he begged not to have his legs cut off, and said he wanted to be put away in a nice new box, and when questioned as to what he meant by that he said he didn't want to be dismembered. He described the day of the tragedy; that he went to his brother's house; that he threw himself at his brother's feet, and kissed his feet and apologized to him, and then got up and cut his head off. And then he spoke about leaving there, and going to some other woman's house—some woman's house—and demanding keys of her, which she refused, and thereupon he drew his revolver and shot at her. And when questioned as to why he wanted to shoot the woman, he said he wanted to get the keys to get in the house, and get a good sharp knife to cut his throat with. He was very suspicious of all that came in contact with him at that time—his lawyer and doctor, and every one."

The witness diagnosed the disease as paranoia, and, after describing this disease, testified that from the facts in the case as he had heard them testified to, from the examination that he had made, from the suicidal tendency, and taking into consideration the manner in which the killing was done, it was his opinion the defendant was on the 20th day of June, 1904, when the homicide was committed, suffering from paranoia. The witness further testified that in all probability the disease was chronic, and had been coming on for years; that probably he was incurable; that he had been the subject of fixed and systematized delusions; and that his suicidal tendencies were symptoms of insanity. The cross-examination of this expert did not in the least degree shake the force of his testimony.

Dr. Little, another expert, described the examination he made of the defendant in all salient respects similar to that of Dr. Macumber, and diagnosed his mental condition as one of progressive paranoia, which in his opinion was chronic and probably incurable. His opinion, based upon the evidence that had been given in the case and from his examination of him, was that the defendant was insane on the day he killed his brother, and had been for a long time prior thereto. On cross-examination Dr. Little went more into detail of the reasons why he reached that conclusion.

In rebuttal the people called one Dr. Gibson, the committing magistrate before whom the defendant was first taken after the commission of the crime, and he testified that the defendant understood the question then put to him whether or not counsel should be procured for him, and answered that question intelligently.

The people called Dr. Payne, a physician and examiner in lunacy, who was the physician at the jail where defendant had been incarcerated.

He described his examination of the defendant, and stated that, as far as he knew, the answers obtained from him were intelligent. When asked what his opinion was as to whether defendant was sane or insane on the 20th of June last, he stated:

"I hardly think that is a proper question to me. I don't know anything about his condition at that time. As to his present condition, from what I have seen in the jail, I have ascribed a great many of his symptoms to fear, rather than insanity. This thing has been uppermost in his mind the whole time, about killing the brother, and that he was to die, and that he wanted to die. I don't suppose I am in the accepted meaning an expert to give an opinion on paranoia. Q. What is your opinion as to his sanity at the present time? A. He has always answered the questions and given me the same answers until this morning he refused to answer questions. At the present time I should think the man is sane."

On cross-examination this witness still maintained that at the time of the trial he believed the defendant to be sane, but disclaimed any ability to speak on the subject of disorders of the mind as an expert, stating that he was testifying as an ordinary practitioner, and that he would not assert that the defendant was not suffering from paranoia.

Dr. Young, a resident physician in the village where the case was tried, was also called by the people in rebuttal, and testified that at the time of the trial he believed the defendant to be sane. He made an examination of him the week before the trial. This witness did not testify whether he could form an opinion as to defendant's sanity on the 20th day of June preceding. He further stated that at the time of his examination he could not find any evidence of paranoia. On cross-examination he said he was simply a regular practitioner, and did not pretend to be an expert, nor could he testify as such. He declined to distinguish between hallucination and delusion, and said he had no knowledge of hallucination or delusion. In giving their evidence the two doctors called by the people do not appear to have taken into consideration the history of the case prior to their respective examinations of the defendant.

A neighbor of the defendant, who appeared to be American born, was called, and testified that in the preceding April he had a conversation with the defendant in which the latter appeared to be rational.

The jury found a verdict of guilty of murder in the second degree. The defendant then moved for a new trial, on the ground the verdict was contrary to the evidence. The motion was denied, and an appeal comes to this court.

We are of the opinion that this judgment should be reversed, for the reason that the verdict rendered by the jury is against the weight of the evidence. That the defendant was the subject of startling delusions within a short time before he committed the homicide is established by apparently disinterested witnesses, and is undisputed. The pursuit of himself by little children, the design on his life by the Polish friend, his brother's enmity, the felonious purpose of the society of men, and similar stories he told, were all curious fictions of his imagination. No suggestion is made at the time of the exhibition of the evidence of his delusions that he was shamming, and this must be taken as reasonably cogent proof of defendant's unbalanced mind directly before the 20th of June. While the proof is not replete with evidence of similar

delusions since his arrest, similar instances are referred to in the evidence of the physicians who examined the defendant. The people have supplied no direct evidence that the defendant was sane on the day the act was committed, or about that time. The only evidence which goes back as far as that was the testimony of his neighbor, who conversed with him in April, some two months or more before the 20th of June, and who said that from that conversation the defendant seemed to him to be rational. The defendant's experts appeared to have taken into consideration in forming their opinion the history of the case prior to their respective examinations of the defendant, and even prior to his arrest; the people's experts not only do not assume to speak as to his mental condition in June, but do not appear to have taken into consideration his past history in forming their opinion as to his sanity.

The total absence of any real motive for so unfortunate a crime, and the circumstances accompanying its horrible execution in front of the deceased's premises in broad daylight, strongly corroborate the satisfactory evidence otherwise adduced in behalf of the defendant.

The result of the jury's deliberation, in my opinion, shocks a correct sense of right, and in the interest of justice this court should reverse the judgment, set aside the verdict, and grant a new trial. All concur.